Next case is Tristrata Technology v. Mary Kay, 06-13-2012. Tristrata Technology v. Mary Kay, 06-13-2012. Tristrata Technology v. Mary Kay, 06-13-2012. Tristrata Technology v. Mary Kay, 06-13-2012. Column 13. Lines 15-36, Your Honor. Two paragraphs. I see them. Thank you. And you have to read both paragraphs together. The Appellee's brief said, well, it doesn't say that low concentrations only work in the dermis. It doesn't say that in so many words, but when you read the two paragraphs together, you see that's exactly what the import of it is. In other words, it says in the first paragraph, the low concentrations do these things in the epidermis, or stratum corneum, which is the upper larynx. Then it says we've also discovered that intermediate to high concentrations cause profound effects in the dermis as well as the epidermis. The only reading of that is that the first one doesn't get down to the dermis. Low concentrations don't get down there. And you have to up the concentration to intermediate or high. It seemed to me reading that section that what the specification was saying was that while higher concentrations might be more effective, that doesn't necessarily mean that low concentrations are ineffective. It's not a question of effective or ineffective, Your Honor. I submit it's a question of whether it gets to the dermis or not. They have to get to the dermis. They might do some nice things in the epidermis with low concentrations, but that doesn't enable the claim and it doesn't prove infringement. In order to prove infringement, they had to have a claim construction that would go down to like 1% to 5%. But where in the patent does it say that it doesn't get to the dermis? Well, as I just said, if you read the two paragraphs together, the first paragraph, and these are observations based on the inventor's testing and observation, they said the low does such and such things in the epidermis. Then it says we've also discovered that when you up the concentration, you also get not only effects in the epidermis but in the dermis. To me, the plain reading of those two paragraphs together is they don't enable epidermal action with low concentration. Counsel, even if we agree with you, isn't there substantial evidence in the record in the form of testimony of one of skill in the art that one of skill in the art would know how to take the teaching of this? Because I agree. Look, that's the portion I have highlighted too. That's the most concerning portion of this patent. It seems in conflict almost with other sections in the prophetic examples where they seem to suggest that low concentrations might work on treating wrinkles, but then here in the testing seem to suggest that maybe they don't. It's not unequivocal. And isn't there other evidence in the record, though, substantial evidence from which a conclusion could have been drawn that one of skill in the art would know how to take this teaching, tweak the pH and the concentration of the hydroxy acid and come out with a low concentration that would work to get to the dermis? First of all, Your Honor, this is a matter of law. This isn't a question of weighing evidence. What we are saying under the AK case is this statement is enough on its face to be a statement by the inventors that this invention does not work at low concentrations and you need to have high concentrations. And therefore they don't enable the full scope of the range just as in AK. They didn't enable up to 10% silicon. Same thing here. They don't enable lower amounts of AHAs. Secondly, there's only one example in all three patents that even purports to suggest that a low concentration by itself will get rid of wrinkles, and that's example 53 in the earliest patent, 171. However, the 171 patent also says you need intermediate to full strength. And that one example doesn't say that it actually works to remove wrinkles. It says it's a 2% solution for dry skin and wrinkles and other things. It's a whole litany of things. I agree that's hard. This patent does list age spots and dry skin and yellowing and all these different things that could be treated and then there's low concentration, intermediate, high. I mean, I see certainly the argument you're making, but while non-enablement and in the JAMAL context, I understand, is a question of law. I mean, there are underlying facts, and isn't that something that we should look at because we have to figure out was the district court right in denying JAMAL because the jury verdict was supported by substantial evidence with regard to these underlying facts, namely what one of skill in the art would say is required in the way of undue experimentation, things like that. Well, what I'm suggesting is there isn't substantial evidence. Number one, if you look at all three patents, you really come up with nothing except the negative statement. The other two patents really affirmatively say you need intermediate to full or intermediate to high. So they don't even support the low, and this one says the low doesn't work. And then as I say, there's one prophetic example that there's no indication. I mean, the first thing listed for that one example, 53, is dry skin, which Pelley says is an epidermal condition. So there's no evidence that 53 got anywhere near the dermis. But let's look at Dr. Wiener, okay, because that's what they point to for substantial evidence of enablement. The bottom line that he said was, I hope someday we can find a potent enough acid or a good enough permeation enhancer to get down to the low concentrations, to let us use low concentrations. That's not a statement of substantial evidence of enablement. That's an agreement that we don't have enablement at the lower part of the range. And that statement by Dr. Wiener was at A1086, which we cited in our blueprint at page 13. So even he couldn't, when you sweep away all the, because you can wave hands, and you can talk about dry skin and pruritus and eczema, but we've got to focus on some basic things here. This case is only about wrinkles and fine lines, not the other things. And it's only about whether or not it goes into the dermis at low concentration. And when you sweep it all away, there isn't substantial evidence. There is non-enablement as a matter of law. And the third point I wanted to make is we should have had a new trial, because even if you disagreed with us on the non-enablement as a matter of law, and we think you should agree with us, we should have had a new trial on non-enablement, because the judge excluded a key piece of evidence. The Neostrata brochure. Yes. Yeah, I wanted to ask you about that. Would the Neostrata, if it was included, would that have made a difference with regard to enablement? I understand it would make a difference overall with regard to how people, when they converse with customers about wrinkles, you know, what do they mean, dermal versus epidermal? The infringement issue. Yeah, I understand. It's certainly relevant to the infringement issue. Right. But does it really matter for the enablement? And if so, explain to me how. Because of the Chiron v. Genentech decision of this court that said that a relevant piece of evidence on non-enablement is the failure of the patentee to commercialize the invention. And that was the case in Chiron v. Genentech. That was relevant evidence, and the court should not have excluded it here. An offer of proof was made. After the original arguments were made for non-infringement, a separate offer of proof was made below saying this is relevant to non-enablement, and here's why. And he cited it to Genentech case. Nevertheless, the district court refused to allow it in. And I'm running low on time. May I go to my next point? But does the brochure actually show a failure of them to commercialize, or does it just show that their product treats wrinkles at the epidermal layer, that their particular product does? The three brochures taken together say these products work on the epidermis, and they're all below concentration, 8% or less glycolic acid. So they all make clear that's what they do. Then they also, in combination with another piece of evidence that was admitted, was the statement of the inventor in 1993 in his presentation, Dr. Van Scott, who said, you know, these formulations, these commercial formulations are low, and we've been unable to have any dermal effects with them. So he even confirmed what was true at the time. Okay, but that got in, right? I mean, that was admitted. But not the literature itself that made that clear. And I want to go to the other thing that didn't get in, because here is the key thing that didn't get in related to the non-infringement. I think the literature was more powerful than a general statement if the jury had seen that they had been unable to make these things at low concentration. But the other thing was Exhibit 536, and that was the excluded brochure that talked about action of wrinkles. And Exhibit 536 is an 11-565 of the record. Mr. Porcelli, you know the only activity that is given greater deference than a jury decision is a trial judge's decision to admit or exclude evidence. But I'm coming to why this is prejudicial and abuse of discretion. The statement on that page, 11-565, the system can be used to help correct epidermal conditions such as fine lines and wrinkles. Epidermal conditions such as fine lines and wrinkles. Throughout the entire case, once they won the motion in Limine, their whole theory was, wrinkles are all dermal. And in fact, one of their witnesses went so far as basically, not quite lie, but to speak totally in conflict with that statement, that there are such things that they acknowledge the existence of epidermal conditions such as fine lines and wrinkles. We could not rebut their central theory. The central theory that they put in the whole case was, wrinkles are dermal, wrinkles are dermal, a mantra. And the one piece of evidence that would have destroyed it, destroyed Mrs. Green's testimony, and impeached her, and allowed us to prove non-infringement, the judge said no. And we did all we could to preserve that. I'm going into my rebuttal time. Unless there are questions, otherwise I'll save it. We'll save it for you. OK. And I would also say, I rest on the brief on the anticipation. Mr. Tresi. Thank you, Your Honor. May it please the court, counsel. Your Honor, let me go right to what the issues are here. First of all, we have a stipulated claim construction in this case. And all defenses of the defendant went to the jury. They said that their products only affect the epidermis, and that low concentrations don't. That was their position in the entire case. Now, the problem with that is that their own clinical studies showed the contrary. And their witnesses testified to the contrary. The specifications don't teach against low concentrations. It teaches to low concentrations. And it says that they will work. In the treatment of wrinkles? Where does it say that? Absolutely, Your Honor. If we go to, first of all, they only pull out the 988 specification in column 13. Humor me. Focus on the 988. You want the 988? We'll go to that, Your Honor. If you go, first of all, to the portion citing that I believe Your Honor stated that she underscored also, which is column 13, lines 15, I believe, through 26. What is being discussed there is how alpha-hydroxys work. They work from the bottom up. They penetrate through. And what counsel said is they've got to get to the dermis. The fact is, once you penetrate the stratum corneum, they go to the dermis. There's no barrier after that. The stratum corneum is the barrier. And the teachings and the pattern must be taken in the entirety of the specifications, which talk about bioavailability, giving the active substance to the dermis. Counsel, isn't the stratum corneum? I'm sorry. And, Your Honor, at that position, it's precisely what you said. They don't eliminate. What they're trying to do is shoehorn this into the AK Steele case. And I'll go to the AK Steele case. But this goes on to the therapeutic side. Mr. Ceresi, if you would listen to the question, please. Judge Moore has a question for you. But isn't the stratum corneum part of the epidermis? It's not part of the dermal layer. When you say you penetrate the stratum corneum, you're saying I'm into the epidermal layer. You're not saying I'm into the dermis. Your Honor, once you penetrate the stratum corneum, that is the protective barrier to the skin. Once that's penetrated, the alpha-hydroxy acids continue to permeate down and hit the dermis. Where is it? That's the test. And if you go to therapeutic effects, Your Honor, and it goes over on column 14, when we're talking about a home treatment where you're going 5% to 30%, all right? And if you go to the other patterns, you'll find other explanations of how the higher it is, the more effective it is. In the 3.7.0, it talks about the lower concentrations at 5 to 10 get there quicker, teaching that if it's lower than that, it gets there slower. That is why Mary Kay, in its instructions for use, said you use this continuously. Their products show that low concentrations get down because they used the formulas at the low concentrations. They were over 1% up to 5.1% in their products. And they said they used them continuously. And in them, they showed effects on the dermis. They showed on elasticity, the development of collagen and elastin, and the development on gays. But even if their products do, and I certainly understand your case for that, that doesn't mean that the patents enable one of Skill in the Art to do it. Even though they might have figured it out. Maybe they were really bright and they figured it out after lots and lots of experimentation, but that doesn't mean the patents enable for it. That's where one of Ordinary Skill in the Art has freed the patent around, and that's what was testified to by Dr. Wiener. And in fact, even Dr. Drake... What did Dr. Wiener say, though, about it? Didn't he say, you know, I hope, like they said, that we could get to this? I mean, this is the crux of what's bothering me about this case. If you take the one simple line that they point out on Dr. Wiener, which was down at the 0.1 tenth of 1%, which is, you have to read his entire testimony in context, and that's at pages 281 and 282, at 1086 of the transcript. But if you take his testimony in totality, he shows how one of Ordinary Skill in the Art reading these patents, and he went through it in detail, column by column by column, showing the bioavailability, the percutaneous absorption of the product, and that gets to the point you were making, Your Honor, Judge Moore, about how does it get down to the germs. Once it breaches that stratum corneum, which is so very, very thin, it's like one strand of hair. I don't have much hair, but it's like one strand of hair. Once it breaches that, it continues to permeate down, and that's why, in their formulas, they put in permeation enhancers, which he again testified to. And indeed, Dr. Drake, who didn't even know that pH was a logarithmic scale, but even she testified, and this is the defense expert, that the patents have guideposts and teach one which way to go in terms of concentration and the pH factors. But this column 13, I mean... You're back in 1998. You're telling me that just because, when it penetrates the stratum corneum, that means automatically it's getting into the dermis. Well, it just seems contradicted by exactly what column 13 says, is that at low concentrations, it penetrates the stratum corneum, and that says we have also discovered that compositions at intermediate to high, when topically applied, cause beneficial effects in the dermis as well as the epidermis. Cause profoundly. It changes as it goes up. The higher the concentration, the more rapid and more efficacious the active chemical would be. And that's what's being said here. And if you look at the lower part, it says we have found that compositions containing low concentrations, etc., this effect predominantly occurs among corneal site cells at inner levels of the stratum corneum, i.e. near the junction to the granulate, in other words, right down by the dermis. Near it. I agree, near it. And then, Your Honor, it goes on. Therefore, they are not typical kerolithium salts, etc. What they're describing there is what was done before, and that worked from the top down. It's telling you about the mechanism of how alpha hydroxy acids have this beneficial effect. And the more you move up the scale, the more profound is the effect. And they tested these. Counsel points out in the 171, the 2%, well, they tested those. And if you look at column, in the 370, at column 10, or excuse me, 18, 35, it's talking about the lower ones, or what you might call intermediate, 10 to 20%, were judged to be more efficient in eradicating age spots, wrinkles, and keratosis within shorter periods of time. So that the lower you go, the longer it takes. And critical to that, Your Honor, is Mary Kay knew this. That is why their tests, their clinical tests, went from 4 to 8 weeks. If it only worked on the epidermis, why would you need it? The epidermis is entirely exfoliated within 28 days. We wouldn't have wrinkles. Well, sir, lots of women would like to look better tomorrow rather than wait 28 days to look better. Well, Your Honor, I agree with that. Men share it, and that's why they put makeup on and moisturizers. This goes to wrinkles. And if you want a moisturizer, that's fine, put it on, you'll look better. You don't even have to worry about the next day. It's today. What about the inadmissibility of the Neostrata brochures? Does that have any impact on the enablement issue? I understand how it might impact infringement, but is there any impact of that on enablement? It has none on that, Your Honor. If we just step back and think about this. To show enablement, I'm going to show a brochure. This is why I would like the court to take particular care to look at pages A1374 to A1384, because there it's laid out. Contrary to what counsel said, this is what counsel was trying to case her in talking about the brochures. I didn't intend to show anything with fine lines and wrinkles. It was to show how the technology works. I want to impeach her on the biodermal effects. There was a complete discussion between the court and defense counsel, up to the sidebar twice. And then, Your Honor, directly to your point, at the very end, they said, well, if these products have such great impact, they're such a profound invention, you didn't even bring in your own studies to show enablement. Flat out false. Court counsel, Ms. Conlon, went up to the bench and said, Your Honor, they are on the exhibit list. We'd like to go back now and get these in. Answer from defense counsel, I withdraw the question. I withdraw the question. What those showed was that low concentrations affect the dermis. And they completely eliminated that. And the court went on and had this discussion with counsel. He was trying to impeach. He was trying to say, look, you don't talk about dermal effect or dermal biosynthesis in your advertising materials. So the court allowed extensive cross-examination on that, over 10 to 15 pages in the trailer. Why didn't they let him in to impeach her? I mean, they would have impeached her. She represented exactly what the brochure said, except she said the opposite of what they really say. No, she did not. Oh, yes, she did. Why didn't they let her in? I mean, it might be a harmless error in the end, but why not let her in? Well, it is harmless error, Your Honor. I don't think they were relevant for any purpose. How is it relevant? Impeachment? Impeachment, and that's what the court said. But they didn't impeach because she said, we don't do that. She admitted they don't say they have dermal or biosynthesis. And then that's why he said, and he weighed it. He said, you're absolutely correct, Your Honor. I got exactly what I wanted, right in the transcript. That's what he said. I don't need it. Now, I would step back and say, if you're going to show infringement, don't you show what this product is, the accused product, and whether or not it practices the invention. What does it make any difference what some other product says or what they say? They may not want to claim dermal effect. The issue is whether or not the particular defendant and its accused product infringes the patent. So I don't think it was relevant at all in direct response to your question, Your Honor. But I'm not calling the balls and strikes. But in the totality of the evidence, the evidence was overwhelming in this case with regard to what happened. I mean, the substantial evidence, it's stacked up a mile high in this case. And what the defense is asking Your Honors to do is to say, wait a minute. We lost. We tried this. And now we want you to be a super jury. We want you to judge the credibility. We want you to draw the inferences in our favor, not the prevailing party's favor. I think that the real telling sign on that is his so-called judicial admission, which they mentioned. Open statement, they mentioned cross-examination of every one of our witnesses. They cross-examined. Closing argument, they argued. And it's not an unequivocal statement. It's talking about what a consumer may think. That just goes to show what we're trying to do here. The evidence is overwhelming. I mean, when you talk about low concentrations, the 171 patent, column 2, column 3, column 13, column 14, column 24, column 32. In the 988, columns 2 and 3, columns 10, columns 12, columns 13, they did have an example in there. Example 10 was 2%. Column 14, I mean, it goes on and on and on. And then you have an expert who comes in and says precisely and exactly what these patents, including the 988, taught one of ordinary skill in the art. And if you look at Dr. Drake's, and I would look at that closely too. It's right at the end of her testimony. And this is their expert on enablement. I don't think there's enough guideposts. And then she makes a mistake again on pH, and she says it goes to 99. And so pH doesn't go to 99, doctor. And we go back, and then we start going through the specifications. I said, there's all kinds of teachings in there, isn't there? That's what you have there. And that's on every one of those patents. The evidence was absolutely overwhelming. And this is not like, he wants to shoehorn this into A.K. Steele. A.K. Steele had, you know, this was, and Judge Lurie, you wrote the opinion, so obviously you know the case. There was only 600 cases in the past. Well, I'm sure you remember all the others. But these were all the odd-numbered claims. And what it said here is that you cannot go above 5% by weight, so you can't go above it. And the claims then said 10%, at least 10%, up to 10%, up to about 10%, and another one said at least 6%, directly contrary to what was stated in the case. And in the case, as Your Honor wrote, we conclude the specification is inadequate as a matter of law because it expressly teaches against it. Worse than being silent, the specification clearly and strongly warns that such an embodiment would not wet well. In particular, and then it goes into the 5% and the 10%. Nothing further need be said. And then, again, the plaintiff came in and tried to say that they presented documentary evidence that despite its desire to utilize a Type I aluminum coating, the patent, he was unable to do so. Mr. Soraisi, we can review that case, but your time is up. So thank you very much. Thank you, Your Honor. I'm sorry if I'm short a minute. Well, it's negative. Mr. Forcelli has a little time left. Thank you, Your Honor. I think it's clear that Mr. Soraisi ducked the real issue, which is what I closed with, namely the existence of epidermal fine lines and records and the mantra that they made because that statement could not come in. All he talked about was the other point that was made in the cross of Mrs. Green, which is that the literature didn't say dermal. But that's a weak point. The point that we needed was the point that the literature referred to the wrinkles as epidermal that would have undercut their ability to make this mantra through the whole case. But that doesn't go to enablement. It goes to infringement. Right. Yes, that's correct. But it's solemn infringement. It's prejudicial because we really had our hands tied behind our back. I realize it's not often that you reverse a judge on an evidentiary point. This is the time when it has to be done to submit. Now, on enablement. But counsel, the problem that I find with that argument is that there is other evidence in the record that your treatment, your cosmetics, don't just operate at the epidermal level, but if you look at your own test results, it says varying degree of effectiveness of the various treatment regimens in reducing the deeper lines and wrinkles. And then when your expert was cross-examined on this point, the expert said, well, if it says deeper lines and wrinkles, that clearly means dermal. So this is your test results of your products saying that they have effectiveness at deeper lines and wrinkles. Well, there's piece number one. And piece number two was that there's also testimony and evidence in your line of products that says they continue to have effective results at the eight-week point. Well, if the epidermal layer turns over every 28 days, that's four weeks. The only effectiveness you would need to be worried about at eight weeks is dermal effectiveness. And so while it doesn't say dermal in that passage, I mean, the fact that you're claiming that your products have effectiveness at the eight-week point would, to me, mean dermal from a technological standpoint. So tell me, I'm sorry, I'm knocking up all your time, but hopefully the presiding judge will give you a chance to at least answer. We'll give a chance to answer briefly. Not necessarily, Your Honor, because the epidermis is growing forward. So that the 28 days doesn't mean that it's all gone. It's continuing. It's a continuing process. So it can well have epidermal effects beyond four weeks into eight weeks. And that's the fallacy of an argument that assumes that it's all scraped away at 28 days. It's not. It's a constantly evolving process. And I would point out that on the enablement issue, there's no... What about the test results? I'm sorry to cut you off. But what about the test results where you actually, in your test results, or your client's test results, they say that it's effective in reducing deeper lines and wrinkles. And then your expert admits that if it says deeper lines, that has to mean dermal. Well, Your Honor, I think all the testing was consistent with effects in the dermis. If you look at the ballastometer and all those other things. And even that statement doesn't necessarily say it was in the dermis. But the point is that the jury was so pounded with this mantra of wrinkles are dermal, wrinkles are dermal. And when we tried to cross-examine, we couldn't. In fact, and here's the worst point, the expert, Wiener, took advantage of the fact that the claim construction was wrinkles were dermal because it said, well, of course, all the literature by Mary Case says wrinkles. Therefore, according to the claim construction, that's dermal. Well, the claim construction only applied to the claim. It didn't apply to the literature. And he used that. Again, we couldn't cross-examine with their own literature, which referred to epidermal fine lines and wrinkles. And we think that that was prejudicial. As far as the statement in the patent about low concentrations reaching the dermis, there's no statement, and I'm going to enablement, if I may. May I finish this point on enablement? Just finish the sentence, please. There is no statement in any of the patents that low concentrations reach the dermis for affecting wrinkles. In Column 13, despite Mr. Cerisi's statement about low concentrations, Column 13 has no indication that a low concentration has any effect in the dermis at all. Now, he says, well, it's profound if it's in the dermis if it's at high, but there's no indication there that there's any effect in any of the patents. Thank you, Mr. Porcelli. I think we have your case. We'll take the case under advisory. Thank you.